May it please the court, Brad Phillips on behalf of Defendant Intervenor and arguing on behalf of all appellants, your honors. Arizona's Clean Elections Act, including the matching funds provisions, were enacted against the backdrop of one of the nation's worst state-level corruption scandals, ASSCAM, which occurred even though Arizona at the time had already enacted low contribution limits and disclosure requirements. That act has both enhanced political speech and the competitiveness of elections in Arizona and has reduced actual and apparent corruption in Arizona politics without burdening political speech. There has been no repeat of the scandals of the 1990s since enactment of the law. The number of contested races in Arizona has increased significantly. Public funding has made it possible for many candidates, including So I don't think we have any policy to make for the state of Arizona, so whether it's a good law or a bad law is irrelevant to us, is it? Your honor, my point is not whether it's a good law or a bad law. My point in discussing these facts is to show both that the law has, in fact, furthered Arizona's compelling interests in reducing actual and apparent corruption and in enhancing political speech in Arizona, and that the law has not imposed any significant burden on political speech so that it is subject to intermediate scrutiny. And I think these facts are, in fact, directly relevant to that, although they also, we would suggest, support the policy that was the purpose of the voter's election. We could have policy arguments either way. I mean, maybe it's a good law for all the reasons you say, and maybe it's a bad law because the people that really know candidates, as opposed to just seeing pretty faces on television, are the contributors, and it's a pretty good measure of whether a person deserves to get elected, whether he gets contributors. I mean, people could see it as good or bad. Also, people could see it as good or bad that the taxpayers have to support whatever Yahoo! wants to fill up their TV screen with ads for six months. Your Honor, I agree with you that the issue is not a policy issue, and as I say, I don't advance these facts to make a policy argument, but rather to support, I think, what are the two fundamental pillars of our argument here. Look, the issue is Davis. The issue is whether Davis should be extended or limited. Your Honor, I think that's all, really, isn't it? I'm not sure it's completely all, but I totally agree with you that it is the acore issue here, and let me turn immediately to it. And I think the reason why So, yeah, you've got to limit Davis. Okay. How do we express the limitation you think is appropriate? Let me do that, Your Honor. For two reasons, we think Davis does not apply here, does not require the result that the district court reached here. First, in Davis, the court applied strict scrutiny. We believe here intermediate scrutiny should be applied. In Davis, the court applied strict scrutiny because there the trigger that resulted from spending of funds by one of the candidates caused that candidate to be subjected to discriminatory contribution limits. The court used the words discriminatory contribution limits repeatedly. Those two candidates, the self-funded candidate and the non-self-funded candidate in Davis, were, from a regulatory perspective, identically situated. They were similarly situated, but for the fact that they were subjected to these different contribution limits, and the court focuses over and over on that, and for that reason concludes that there was a substantial burden on speech, and therefore the strict scrutiny applies. And you can tell Are you conceding that if strict scrutiny does apply in this case, that you lose? Absolutely not, Your Honor. And I could turn to that after. I can explain why we think that. No, no, go ahead. Absolutely not, Your Honor. And, of course, in Davis, strict scrutiny applied, but there was no anti-corruption or enhancement of speech purpose involved in Davis, but that's obviously another distinction. But you can tell clearly that the court is focused on the discriminatory nature of those contribution limits, not only from the language of the opinion using those words over and over again, but by the fact that in Section 3A of the opinion, the court explicitly says twice that if the trigger provision, Section 319A, had simply elevated the contribution limits for all the candidates in the race, that Davis would not have had a constitutional claim. So it's clear that what the court is focused on then in Section 3B is the fact that there is a discriminatory contribution limit as it applied to similarly situated candidates. Here, Your Honor, we know that it is constitutional to treat a publicly funded candidate and a traditional privately funded candidate differently. From a regulatory perspective, Buckley so holds. You can impose an expenditure limit on one and not the other. You can have, in fact, the vote choice case says that you can have different contribution limits for a publicly funded candidate and a traditional candidate. The cap gap issue in vote choice, just like the different contribution limits in Davis, except those candidates were not publicly funded and not publicly funded. You said there were two reasons. What's the second? The second reason why Davis doesn't control you? The second reason to limit rather than extend Davis. Well, I think the reason why it doesn't control you, the second reason why is if you applied strict scrutiny, the matching funds here survive strict scrutiny because matching funds here do serve two compelling interests, the anti-corruption interest that the Court has identified and the interest in enhancing political speech. Whereas, too, in Davis, there was no anti-corruption rationale. It was simply a leveling the playing field rationale by limiting one person's spending, and the Court said that's not a permissible purpose that you can use to satisfy strict scrutiny. Going back to why you should apply intermediate scrutiny. I don't understand. Why does it prevent corruption here? We've still got the limits, so no one can give the non-publicly financed candidate enough to get them in his pocket. Correct, Your Honor. The law here serves the anti-corruption rationale in the same way that the presidential public financing system upheld in Buckley serves the anti-corruption rationale. It does it really in multiple ways. One is that by providing public funding and sufficient funding to allow candidates to run competitive races, you remove those candidates essentially from the privately financed system that the Court has said is what results in at least potential real and apparent corruption. Only if the contributions are too big. Well, Your Honor, the Court has never said that. I think part of the Court's theory in Buckley was as long as the contributions aren't too big, they're just not going to work as bribes. Your Honor, the Court upheld the public funding system in Buckley, notwithstanding the fact that it also upheld the contribution limits. So I think that you can't read Buckley to say that contribution limits by themselves are sufficient and therefore you can't use other means to address corruption. And, of course, Your Honor, in McConnell, the Court upheld a new regime of regulation, notwithstanding the fact that contribution limits and disclosure requirements were already in effect. Why isn't it discriminatory that the publicly financed candidate gets to run for free and the candidate who's not willing to accept the ceiling, which for a less popular candidate will never be reached anyway with private contributions, has to raise his first dollar? So the ceiling is kind of complicated. Let's say hypothetically they hit the ceiling at $500,000. In order to spend $600,000, the publicly financed candidate, I guess, spends, well, nothing. And the privately financed candidate has to raise $900,000. Is that right? It depends on what those ceilings are, and it varies with the circumstances. Your Honor, I think the fundamental reason why it's not discriminatory in a legal sense to impose an expenditure limit on one candidate and provide that candidate with public funds and not impose an expenditure limit on the other but not provide that candidate with public funds but require that he or she raise the money elsewhere is that Buckley says that that is in fact constitutional to permit candidates to choose between those two positions. And so I don't think that whether they're obviously treated differently, but that's a fundamental point of our argument here, is the fact that you treat publicly funded candidates differently from the way you treat traditional candidates doesn't mean you have a discriminatory regime, unlike Davis, where you're treating two candidates who are, from a regulatory perspective, identically situated, you are now treating them differently. You're giving one of them a much stricter limitation on his contributions than you're giving the other. The other reason why intermediate scrutiny clearly should apply here, Your Honor, is that the Supreme Court has consistently said, repeatedly said, most recently in Citizens United, that disclosure provisions, even disclosure provisions that are triggered by a threshold of spending, although they burden political speech, the Court acknowledges that they burden political speech, among other reasons, by potentially deterring a candidate from spending money, or an independent committee from spending money, if they don't want to comply with the disclosure requirement. Nevertheless, those are subject to intermediate scrutiny because they don't actually place any cap, any actual cap, on the person's spending or on the person's contributions. Matching funds, the effect of matching funds, if there is any, is clearly more analogous to the effect of a disclosure provision of that kind, in the sense that as with a disclosure provision, a matching funds provision puts a candidate or an independent spender, gives them essentially a choice. They are free to spend or contribute as much money as they please. Mr. Phillips, Mr. Phillips, your time is running down. I want to ask a different question. I didn't see too much of this in the briefing. What is the rationale for extending this public financing scheme to races where what you call the traditional candidate is self-financed? Your Honor, the anti-corruption rationale is the same for public funding, whether the opponent of the publicly funded candidate is financed by contributions or by somebody who is spending his own money. Because the purpose of public funding, the point is not to deter someone, the traditional candidate, from raising money or from spending money. The point is to free the publicly funding candidate from the need to raise money and also by enabling candidates to run who might not otherwise be able to run, creating more contested races which creates greater accountability. But that's not a goal. The Supreme Court recognizes that it can be furthered by these financing schemes, right? Absolutely, Your Honor. Those are precisely the goals that the court in Buckley recognizes as justifying public funding, freeing the publicly funded candidate from the need to raise contributions and facilitating political speech by allowing candidates to run. Don't you think the later cases really limit the permissible goals under the First Amendment to only anti-corruption or the appearance of anti-corruption? Your Honor, I think that the cases clearly say that corruption and appearance of corruption are in fact compelling purposes. That is in fact one of the compelling purposes that the court identified in Buckley for public funding. And I don't think that anything in the subsequent cases undermines that as a justification for public funding. The Supreme Court has never specifically said that enhancing political speech by providing public funding is compelling, using the words compelling. But I think if you read Buckley, it's quite clear that the court does think that that is a very, very important and indeed compelling interest. And other courts, including the First and Fourth Circuits, have said that that is in fact a compelling purpose. And going back to Judge Kleinfeld's question about the person who is spending his or her own money, the district court focused on that, Your Honor, I think mistakenly in suggesting that the point of public funding system is somehow to deter someone from spending his or her own money. That's not the point. And in fact, that doesn't happen here because of matching funds. The point is to free the publicly funded candidate from having to raise contributions and enhance political speech. And, Your Honor, there's no evidence here that there has been any deterrent effect on spending or contributions. So both because disclosure requirements are subject to intermediate scrutiny and are really analogous to the matching funds provisions here for purposes of assessing what the burden is, and as this Court has said in Lincoln Club, unless there's a severe burden, you don't apply strict scrutiny. And secondly, because the evidence here indicates that there is in fact minimal if any actual burdening effect from the matching funds, intermediate scrutiny should be applied. Unless the Court has further questions, I'll reserve my remaining minute. Thank you. Thank you, Counsel. Counsel. May it please the Court. Nicholas Dronius on behalf of the McComish plaintiffs. I'd like to use seven and a half minutes of the time allotted to the plaintiffs with the balance going to the Martin plaintiff intervenors. With that said, Your Honor. Clerk, please run it that way. With that said, Your Honor. Hold on just a second. We've got to get the time clock set. Thank you. It says 10-12. There we go. There it is. Go ahead. May it please the Court. Your Honor, Your Honors, the issue in this case is controlled by Davis. The lower court was correct to follow Davis. Let's get back to that. In Davis, the gravamen is that if a candidate is self-financed, then the opposing candidate can get $6,900 per contributor. If he's not self-financed, then the opposing candidate can only get $2,300 per contributor. And Davis says that discrimination in how much a candidate can get from a contributor was what triggered the strict scrutiny because that burdened the self-financed candidate's speech. It costs him so much more in effort to raise the money that he needs to compete with somebody who can get three times as much from a happy contributor. Here it looks to me as though that's not so. The non-participating candidate can seek contributions on the same basis as the publicly financed candidate who just has to ask government for the money. And it continues that way until the ceiling is reached for the public candidate, and then the private candidate, if he still has more people that want to support his campaign, can raise money without limit. I don't see where there's discrimination like the $2,300 and $6,900 distinction in Davis. Why should Davis be extended to cover? Well, Your Honor, first of all, respectfully, I think the gravamen of Davis is what it says at page 2771 where it says, while the BCRA does not impose a cap on a candidate's expenditure of personal funds, it imposes an unprecedented penalty on any candidate who robustly exercises those First Amendment rights. So from our perspective, the gravamen of the case is whether or not the regulatory scheme imposes a penalty. And that explains why the court relied directly on day as well as Pacific Gas in reaching its goal. The only penalty I see here is a strategic one. If I spend more money, you get more money. I can talk as much as I want. It's just that I can't shut you down. Well, the fact is it functions as a fine in the competitive context of candidate competition. Well, it's not a fine, though. Well, if it destroys the value of every dollar you spend, it functions as the functional equivalent as a fine. If an ad on the radio costs $85, the non-participating candidate can spend $85 and get another ad, and there's no penalty for it. The only harm that comes to them is that the publicly financed candidate also gets to buy an $85 ad and make his pitch. And that is a constitutionally cognizable harm. Why is that a constitutionally cognizable harm? That's not what Davis focused on. It focused on the discrimination between the $2,300 and the $6,900. Respectfully, Your Honor, I think the two rationales for Davis are fully complementary. And if you notice, Your Honor, the discussion of the difference in contribution limits in detail in terms of discrimination doesn't occur until after the Court first determines that there was a burden on free speech by relying on Day and Pacific Gas for the proposition that the government has no business causing the dissemination of hostile speech in order to exercise your First Amendment rights. So, Your Honor, with all due respect, there is certainly a discrimination. Where does Davis say that? That would be highly relevant if it did. Well, if Your Honor turns to page 2772, there is direct reliance first on Day, where the Court points out many candidates who can afford to make large personal expenditures to support their campaigns may choose to do so despite FCRA, but they must shoulder a special and potentially significant burden if they make that choice. And then a direct citation to Day, which is, of course, the Minnesota matching funds case, with a parenthetical saying concluding that a Minnesota law that increased a candidate's expenditure limits and eligibility for public funds based on independent expenditures against her candidacy burdened the speech of those making independent expenditures. Immediately after the next parenthetical, the Court continues under, again, Bikra's provision, the vigorous exercise of the right to use personal funds to finance campaign speech. The vigorous exercise of the right to use personal funds to finance campaign speech produces fundraising advantages for opponents in a competitive context of electoral politics. And then it has a CF reference, which is an analogy to Pacific Gas, for the proposition that there's an infringement on speech rights if the plaintiff spoke, it could be forced to help disseminate hostile views. So we clearly see that the burden on speech, this is not an equal protection case. We're talking about the nature of the burden on speech, and the nature of the burden on speech created by matching funds is that of disseminating hostile viewpoints. And what's fascinating about this is Davis-Weiss's reliance on Pacific Gas establishes that Pacific Gas is not about forced access. It's not about property rights. It's about the free speech principle that government has no business intervening in the marketplace of ideas to penalize the exercise of free speech by some and favor the free speech of others. That's why this case must be controlled by Davis. Davis is directly reliant upon Day and Pacific Gas, both of which compel an analogy to the matching fund system in Minnesota. And what's even more interesting, Your Honor, is the fact that all of the foreign circuits relied upon by counsel, Leak and Daggett and Gable, all of these cases ultimately stem their reliance from a case called Wilkinson in Kentucky. And what's fascinating about Wilkinson is Wilkinson said, in dealing with triggered elevated contribution limits, that those were okay. And that they were not as coercive as matching fund system like the one in Day. So all of the cases relied upon by counsel to support their claim that there is no burden on free speech for matching funds actually rely on a case that is directly contrary to Davis. So in addition to the logic of Davis relying on an analogy. We also have to assess the nature of the burden, because we're dealing with the level of scrutiny we apply whether it's intermediate or strict. So it's not just a zero-sum game where you say there's a penalty and therefore it's strict scrutiny. So how would you describe the burden in this case as compared to the one in Day? Because Day is one that puts in a direct limit. This is obviously a severe burden, but the court should look first to the purpose of the act and the nature of the regulation in determining the level of scrutiny. And you have to distinguish this case, and I say you have ten seconds. This case has to be distinguished from disclosure and disclaimer laws, because the purpose of disclosure and disclaimer laws is to educate the public about who's financing a campaign. The purpose of matching funds is to suppress speech. Thank you very much. Thank you, counsel. May it please the Court. My name is Bill Maurer. I represent the Martin Appellees, including two independent expenditure groups. In the appellant's presentation, it was noticeable that in their discussion of the choice presented to participating and non-participating candidates, they did not reference the choice presented to independent expenditure groups. There is no choice presented to independent expenditure groups. If they speak, they will have government subsidies. If they speak above a significant amount, and presuming that the privately financed candidate is also coming close to the trigger amount, if they speak, there will be a direct government subsidy to their political and ideological opponents. Now, the U.S. Supreme Court in Citizens United was quite clear that you cannot regulate independent expenditure groups under an anti-corruption rationale. It couldn't be more clear as a matter of law that you cannot regulate independent expenditure groups under an anti-corruption rationale. And the appellants conceded in their oral argument that I'm not sure that I follow that the burden is necessarily the way you describe it. It seems like another possibility would be, oh, suppose that a publicly financed candidate is strongly supported by the teachers' union. It seems as though, and the teachers' union is the independent group, like the ones that you represent. It seems as though what he could do is use the government money, the public funding, to exhaust the war chest of his opponent. And then while his opponent is out scrambling for more money, the teachers' union could come into the campaign with massive expenditures on behalf of the publicly financed candidate, but they're independent, so it doesn't count. So the independent group is actually benefited rather than burdened. The independent group in favor of the publicly financed candidate is benefited in that circumstance. And also in that circumstance, Your Honor, I believe that illustrates the discriminatory and asymmetrical nature of the clean election system, because when the teachers' union makes an independent expenditure against a privately financed candidate, there is no transfer of government subsidy to the privately financed candidate based on the act of speaking by the teachers' union. Now, if there is an independent expenditure made on behalf of the privately financed candidate or against the publicly financed candidate, that money not only subsidizes the political and ideological opposition of that independent expenditure group, it subsidizes the candidate directly instead of an independent expenditure group on the other side. And the United States Supreme Court has made clear repeatedly that independent expenditures are not the same thing as direct candidate speech because of the same reason they don't cause corruption. They're independent. They don't have control over it. In fact, the independent expenditure group's speech may, in fact, not be helpful. So the fact that the appellants have carefully avoided discussing the effect of this on the independent expenditure groups and a self-financing candidate. The burden is that if the independent group supports Candidate A and the government supports Candidate B, the independent group's speech on behalf of A is not as effective? I'm trying to figure out how to phrase just what the burden is. Could Your Honor clarify which candidate is the publicly financed candidate in that hypothetical? I call them publicly financed. Okay. And the independent group proposes the publicly financed candidate. It seems as though it's free to spend as much as it wants supporting the positions that it thinks attach to the non-publicly financed candidate and there's no burden or limitation or penalty for that. The only thing is the candidate who opposes the independent group's positions gets government money. Why is that a burden or penalty? Because under Davis and under Pacific Gas and Electric, Miami Herald versus Tornillo, in this Court's recent decision in the McDermott case, when the act of speaking results in a government benefit going directly to your ideological or political opponent, the United States Supreme Court has recognized that that is a burden on First Amendment rights and that it is subject to strict scrutiny. The Davis Court was quite clear that that was the situation, and it's consistent with a long line of cases stretching back decades. In parenthetical it was clear. It wasn't really the case in Davis. You're talking about the parenthetical referring to Day and the parenthetical about Pacific Gas. Yes, Your Honor. But it is also, substantively, if Your Honor looks at the substance of the cases that we've cited in our brief, Hurley, Miami Herald, Pacific Gas and Electric, McDermott, all of these cases hold for the proposition that the government cannot interfere with the speaker's autonomy as to decide under what circumstances and how much to speak. That is the First Amendment harm in this situation, and it is also the First Amendment harm that brings strict scrutiny in the case. Day was an Eighth Circuit case, not a Supreme Court decision. Pacific Gas is a Supreme Court decision, and the parenthetical certainly supports your argument, but I don't know the facts in Pacific Gas. What were they? Pacific Gas and Electric dealt with a situation where a public utility would send out a newsletter to its customers telling them about all the great things that they're doing about trying to make everything better for their public utility customers. The Public Utility Commission in California ordered that the public utility had to make its envelope available for a counteract or a counter- Now I remember. Now I remember. It was not just support as a taxpayer, as in your case. It was support. You have to put your opponent's flyer in your envelope and mail it out. That's exactly right, Your Honor. And in situations where the court has analyzed Pacific Gas and Electric, they've talked about how it really wasn't that big of a deal to be able to put your opponent's newsletter in your envelope for Pacific Gas and Electric. It's a large, multibillion-dollar organization. It could afford the extra postage, even if that's what it costs. What was the harm in that case was the fact that it created a disincentive for Pacific Gas and Electric to address specific topics, because that would result in a direct government benefit to their political and ideological opposition. It's exactly the same case with different materials as what's going on in this case, Your Honor. And I see that my time is up. Unless there are other questions, I'm happy to address them. Thank you, counsel. Thank you. If I could just make three quick points in my time, Your Honors. First, Judge Kleinfeld, it's precisely the case that what is involved here is a strategic choice. A candidate or an expenditure committee makes a choice. If they think more speech will help their cause, they'll keep speaking. If they don't, they may stop, because then the other candidate won't get speech. That's probably why there's no evidence that anybody actually stops speaking, because they think their messages are better. There's no burden whatsoever. In Citizens United, the Court upheld a disclosure provision on independent expenditure committees, which is a burden that's analogous to the strategic choice that we have here. Your Honor, in Davis, the sentence before the sentence that cites Day, the immediately preceding sentence, the Court finds that what we're talking about in Davis are discriminatory contribution limits. And lastly, going back to Judge Teshima's question, the point of matching funds as they relate to a self-funded candidate is that public funding has to give an assurance to publicly funded candidates that they won't be dramatically outspent. In order to do that, you have to assure them of that, regardless of whether their opponent may be privately funded or self-funded, thereby freeing them from the obligation or the need to raise private contributions. Could you say again how is Day distinguished? The Supreme Court was trying to tell us that the Eighth Circuit was right by citing Day and having that parenthetical. I think what the Court is trying to do with Day there is to say, as the parenthetical of the sentence preceding the citation to Day says, is that there can be situations in which you might shoulder a special and, quote, potentially significant burden. Well, what they say here, they say, see Day v. Holohan, the Eighth Circuit case, concluding that a Minnesota law that increased a candidate's expenditure limits and eligibility for public funds based on independent expenditures against her candidacy burdened the speech of those making the independent expenditures. If all I look at is that parenthetical, it really sounds a lot like the Arizona scheme. If the Court said we agree with a holding of Day, that there is a substantial burden there which doesn't survive strict scrutiny, I would agree with Your Honor. All the Court does is cite an analogous provision for the proposition that there is a potentially significant burden here. But, Your Honor, if the Court, as I say, Section 3A of Davis twice says that if the trigger were a trigger of higher contribution limits across the board, we wouldn't have a constitutional issue. Well, if you think about that, if a self-funded candidate thinks that the contribution limits are going to be increased across the board, many self-funded candidates don't need contributions at all. So that would potentially be a benefit to their privately funded opponent to get a higher contribution limit, even if I, the billionaire, might also get a higher contribution limit. If we stick to Day, do you lose? If you stick to Day, no. Because in Day, Your Honor, the Court concluded that strict scrutiny applied, but that it didn't survive strict, couldn't survive strict scrutiny, because the Minnesota provision had been enacted at a time when there was already essentially 100 percent participation in public funding. And so the Court found that there was no, it didn't serve the purpose of encouraging people to participate in public funding. Unlike in the other cases, including the Eighth Circuit's decision in Rosensteil, where the courts held that it did satisfy strict scrutiny because it encouraged participation in public funding, here, Your Honor, there isn't even 100 percent participation now in Arizona with public funding and matching funds. So that's obviously quite different from Day. If you adhere to Day, I would concede that you would have to apply strict scrutiny. But we think that's the wrong result for all the reasons we've suggested. But if you do, we still think we survive strict scrutiny. Thank you, Counsel. Thanks. McComish v. Bennett is submitted. We are adjourned for the morning.
judges: Kleinfeld, Tashima, Thomas